IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JESSE SCOTT | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 13-5540 |
| BAC HOME LOAN SERVICING, L.P., *f/k/a* | : | |
| *COUNTRYWIDE HOME LOANS* | : | |
| *SERVICING L.P.*, ET AL. | : | |

| | |
|---|---|
| BAC HOME LOAN SERVICING, L.P., *f/k/a* | : |
| *COUNTRYWIDE HOME LOANS* | : |
| *SERVICING L.P.* | : |
| | : |
| v. | : |
| | : |
| JESSE SCOTT AND LOUDINE JOSEPH | : |
| *a/k/a LOUDINE SCOTT* | : |

**<u>MEMORANDUM</u>**

**SURRICK, J.**                                                    **JANUARY <u>26</u>, 2016**

Presently before the Court are Counterclaim Defendant Loudine Joseph's Motion to

Dismiss Counterclaims (ECF No. 22), BAC Home Loan Servicing, L.P. and Bank of America,

N.A.'s Motion for Summary Judgment (ECF No. 47), and Defendant First American Title

Insurance Company's Motion for Summary Judgment (ECF No. 48).  For the following reasons,

Joseph's Motion to Dismiss will be granted, Defendant First American's Motion for Summary

Judgment will be granted, and Defendant BAC Home's Motion will be granted in part, denied in

part, and dismissed as moot in part.

**I.      BACKGROUND**

The operative Complaint in this matter is entitled Amended Complaint To Quiet Title To

Cancel Invalid Mortgage.  (Am. Compl., ECF No. 12.)  Plaintiff Jesse Scott seeks to quiet title

on property that he owned with his former wife, Loudine Joseph, and to cancel a refinance mortgage on which the property served as collateral. Scott claims that the refinance mortgage is invalid and unenforceable because it was executed by his former wife only, and because the deed which purported to transfer title to the property to Joseph solely contained Scott's forged signature. Scott has been living at the property payment-free since mid-2013, and now seeks title to the property free and clear of any mortgage liens. Scott asserts claims against both BAC Home, which holds the refinance mortgage, and First American, which handled the refinance closing.

A.      **Factual Background**[1]

      *1.      The Purchase, Mortgage, and Refinance of the Property*

On July 31, 2006, Plaintiff Jesse Scott and his former wife, Loudine Joseph, purchased a home at 950 Meetinghouse Road, Rydal Pennsylvania (the "Property"). (Deed, First Am. SJ Mot. Ex. A.) Scott and Joseph obtained a mortgage loan in the amount of $427,500 from New Century Mortgage Corporation (the "New Century Mortgage") to purchase the Property. (Scott Dep. 186-87 & Ex. 20 ("Settlement Statement"), BAC Home SJ Appendix 1, ECF No. 47-3.) They purchased the Property shortly after they were married in May 2006. (Joseph Dep. 46-47, BAC Home SJ Appendix 2.) Both Scott and Joseph were listed as the grantees on the Deed. (Deed.) Scott retained Sunny Pierce to serve as the title agent for the purchase. (Joseph Dep. 57-58.)[2] Both Scott and Joseph attended the settlement. There is no dispute about the validity of

---

[1] We view of all of the facts and draw all reasonable inferences therefrom in the light most favorable to Plaintiff, the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

[2] Sunny Pierce was initially named as a Defendant in this matter. (*See* Am. Compl.) Count 2 of the Amended Complaint asserted a fraud claim against Pierce. (*Id.*) On October 8, 2014, an Order was entered dismissing Pierce from the lawsuit. (ECF No. 51.) Pierce's

the New Century Mortgage, or that Scott and Joseph had an obligation to pay the New Century

Mortgage.  (Scott Dep. 187.)  At the time that Scott and Joseph purchased the Property, Scott had

approximately four years of experience working in the mortgage industry.  (Scott Dep. 330-33,

BAC Home's App. 1, ECF No. 47-3.)[3]

The interest rate on the New Century Mortgage was very high—11.5%.  (Pierce Decl. ¶ 9

& Ex. B, ECF No. 47-12.)  Because of this, Scott and Joseph discussed refinancing the mortgage

shortly after purchasing the Property.  (Scott Dep. 196-97.)  Scott and Joseph agreed to look into

refinancing options.  (Joseph Dep. 135.)  Joseph alone applied for and was approved for a

refinancing loan with Countrywide (the "Countrywide Mortgage").  The Countrywide Mortgage

is currently held by Bank of America ("BOA"), and serviced by BAC Home.  Scott was aware

that his wife was applying for the refinancing loan, and authorized the refinancing.  (Joseph Dep.

135; Scott Dep. 458-59.)  Joseph learned from lenders that applying for the refinance without

Scott would result in a lower interest rate.  (Joseph Dep. 133-35.)  Scott contacted Sunny Pierce

to handle the closing on the refinance.  (Pierce Dep. 25-26, BAC Home SJ Mot. App. 3.)

The closing instructions for the refinance included an instruction "SPOUSE TO SIGN:

TBD AT CLOSING."  (Countrywide Closing Instructions, Burnett Decl. Ex. C.)  Pierce testified

that she understood this to mean that Scott was supposed to sign the deed to transfer the Property

from him and his wife to just his wife, Joseph.  (Pierce Dep. 32-35.)  This way, the refinance

---

dismissal was the result of Scott's failure to serve Pierce with the Complaint, despite extensions
to do so by the Court.  (*See id*.)

[3] The Defendants spend a significant portion of their briefs relaying facts that reveal
Scott's extensive background in the real estate industry.  Scott contends that his real estate
background is irrelevant.  While we agree that his real estate background has little relevance for
purposes of this summary judgment, we note that Scott is well-versed in the residential mortgage
loan industry.  He has worked as a residential mortgage loan officer, negotiated mortgage
modifications on behalf of borrowers, and studied to become a mortgage securitization auditor.
(Pl.'s Resp. 7.)

mortgage—which was in Joseph's name—would match the deed.  (*Id.*)  Pierce updated the title search and prepared a new title commitment to submit to the mortgage company, which would reflect the refinancing transaction, "e.g., deleting Mr. Scott's name."  (Pierce Decl. ¶ 10 & Ex. C.)  Pierce also prepared settlement statements and sent them to both Countrywide and to Scott.  (*Id.* at ¶¶ 11-15.)  Prior to the closing, Pierce explained to Scott the reasons for transferring the deed into Joseph's name.  (Pierce Dep. 45, 112.)  She thereafter e-mailed Scott a copy of the unsigned transfer deed.  (*Id.* at 46, 83.)[4]

The closing on the Countrywide Mortgage occurred on November 2, 2006.  (Joseph Dep. 102.)  Pierce met with Joseph to sign the mortgage documents and the transfer deed.  (Pierce Dep. 26-27.)  Scott had not yet signed and returned the transfer deed to Pierce.  Therefore, Joseph was the first to sign the transfer deed.  (Pierce Dep. 36, 69.)  Pierce returned the executed mortgage documents to Countrywide on November 8, 2006.  (Pierce Dep. 96-97; Pierce Decl. ¶ 16.)  However, Pierce did not record the Countrywide Mortgage until over a year-and-a-half later, on June 24, 2008.  (Pierce Dep. 40.)  The transfer deed was also not recorded until June 24, 2008.  Pierce states that she held off on recording the Countrywide Mortgage and the transfer deed because she was waiting for settlement funds from Scott.  (Pierce Dep. 38-40; 61-62.)  Pierce ultimately disbursed the payoff of the New Century loan on March 9, 2007.  (Pierce Decl. ¶ 17 & Ex. K.)  The New Century Mortgage was marked satisfied on April 5, 2007.  (Melley Decl. Ex. 1.)  The New Century Loan was paid off through the proceeds of the Countrywide Mortgage refinancing.

After obtaining Joseph's signature, Pierce mailed the transfer deed, now with Joseph's signature, to Scott to sign.  Pierce recalls that she received the fully executed transfer deed back

---

[4] Pierce's testimony could not be corroborated because Pierce no longer has access to the email account that she used to send the email to Scott.  (Pierce Dep. 43-44; Pierce Decl. ¶ 7.)

4

from Scott and set it aside with the original copy of the countrywide mortgage, with the intention

of waiting to record the documents until receipt of the closing costs from Scott.  (Pierce Dep.

92.)  Scott contends that he never signed the transfer deed.  (Pl.'s Resp. 10).[5]

BAC Home and Scott submitted conflicting handwriting expert reports regarding the

signature of Jesse Scott on the transfer deed.  BAC Home submitted the report of William Ries,

an expert forensic document examiner.  (Ries Report 1-2, Melley Decl. Ex. 12.)  Ries compared

the Jesse Scott's signature on the transfer deed to 28 other known samples, and opined that Jesse

Scott's signature on the transfer deed belonged to Jesse Scott.  Scott submitted the report of

Wendy Carlson, an expert forensic document examiner.  (Carlson Rept., Pl.'s SJ Resp. App. A.)

Carlson compared the signature on the transfer deed to 30 samples of Jesse Scott's signature and

opined that the signature on the transfer deed was made by someone other than Jesse Scott.  (*Id*.)

### 2       *Events Occurring After the Refinance with Countrywide*

On June 1, 2007, after the refinance occurred, but prior to the Countrywide Mortgage

being recorded, Scott and Joseph pledged the Property as collateral for a business loan.  The loan

and mortgage was from Excel Financial to LL Group in the amount of $150,000 (the "Excel

Mortgage").  With regard to the Excel Mortgage, Scott and Joseph warranted that there were no

other mortgages encumbering the property.  (Scott Dep. 248-49 & Ex. 43.)  In May 2010, First

American sought a judgment against Scott and Joseph to recover funds it paid for an assignment

of the Excel Mortgage.  (Scott Dep. 248-49 & Ex. 43.)  First American received a judgment from

the Montgomery County Court of Common Pleas in the amount of $150,000, plus $46,600 in

prejudgment interest.  (Melley Decl. Ex. 3.)

Scott made payments to Countrywide on behalf of the Countrywide Mortgage.  On

---

[5] Joseph and Pierce both stated that they did not sign Scott's name on the transfer deed.
(Joseph Dep. 296; Pierce Dep. 10-11.)

February 15, 2008, he wrote a check made out to Countrywide in the amount of $5,740.10, with

a note indicating "house payment."  (Scott Dep. 235-37 & Ex. 31.)  Scott testified that the check

represented a couple months of mortgage payments on the Countrywide Mortgage.  (*Id.* at 237.)

Scott does not dispute that he was aware of the Countrywide Mortgage as early as February

2008.  (Scott Dep. 318.)

      In the spring of 2008, Scott made several calls to Countrywide in an attempt to negotiate

a modification of the Countrywide Mortgage.  (Burnette Decl. ¶ 16.)  On these calls, he

identified himself as Loudine Joseph because his name was not on the Mortgage.  (*Id.*; Scott

Dep. 257-59.)  On July 17, 2008, Joseph signed a loan modification agreement.  (Joseph Dep.

Ex. 8.)

      In December of 2008, Joseph defaulted on the Countrywide Mortgage.  (Burnette Decl. ¶

18 & Exs. F, G.)  On May 11, 2009, BAC initiated a foreclosure action in the Montgomery

County Court of Common Pleas.  (Burnette Decl. ¶ 19, ECF No. 47-9; Joseph Mot. Dismiss ¶ 1,

ECF No. 22.)  On June 25, 2009, the court entered a default judgment against Joseph.  (Burnette

Decl. ¶ 19.)  The Property was scheduled to be sold at a sheriff's sale in September 2009;

however, that sale was stayed many times.  (*Id.* ¶¶ 21-22.)  One stay was the result of an action

by First American Title Insurance Company against Loudine Joseph in the Montgomery County

Court of Common Pleas.  (*Id.* ¶ 21.)   The sale was also stayed as a result of the instant lawsuit

filed by Scott.  (*Id.* ¶ 22.)   On August 1, 2013, Joseph notified Countrywide that she no longer

wanted the home and did not want to modify the mortgage.  (Burnette Decl. ¶ 23.)  On June 25,

2009, a default judgment was entered against Joseph.  (Joseph Mot. Dismiss ¶ 4.)  Damages were

assessed against Joseph in the amount of $478,464.69.  (*Id.* ¶ 5 & Ex. A.)

      The current principal balance of the Countrywide Mortgage is $398,317.12, and the

6

current escrow deficit is $69,509.14.  (Burnette Decl. ¶ 24.)  Since 2008, there have been no

payments made on the Countrywide Mortgage.  (Burnette Decl. ¶ 25.)

On November 2, 2009, Joseph initiated divorce proceedings against Scott in the

Montgomery County Court of Common Pleas.  (Melley Decl. Ex. 6.)  During the divorce

proceedings, Scott did not claim that the transfer deed had been forged.  (Scott Dep. 202.)  The

divorce between Scott and Joseph became final on April 3, 2013.  (Melley Decl. Ex. 7, ECF No.

47-11.)  After BAC Home obtained a foreclosure judgment against Joseph, she abandoned the

Property and changed the locks.  (Joseph Dep. 44.)  Scott was not residing at the Property when

Joseph left, but he moved back to the Property in mid-2013 after Joseph moved out.  (Joseph

Dep. 44-45; Scott Dep. 45.)  Joseph does not know how Scott got back into the Property since

she changed the locks.  (Joseph Dep. 44.)  Since mid-2013, Scott has been living in the Property

without making any payments.  BOA has been paying all real estate taxes and insurance on the

Property.

### B.     Procedural History

Scott commenced this action by filing a complaint to quiet title and cancel invalid

mortgages in Court of Common Pleas of Montgomery County on August 23, 2013.  (Compl.,

Not. of Removal Ex. 1, ECF. No. 1)  The action was filed against Defendants BAC Home and

Sunny Pierce.  (*Id*.)  On September 20, 2013, BAC Homes removed the action to this Court.

(Not. of Removal.)  On December 17, 2013, Scott filed an Amended Complaint naming First

American as an additional Defendant.  (Am. Compl.)  The Amended Complaint asserts three

counts against Defendants:  (1) injury to title against BAC Home; (2) fraud against Sunny Pierce;

and (3) failure to supervise against First American.  (*Id*.)  Scott seeks a declaration that the

Countrywide Mortgage is null and void, cancellation of the Countrywide Mortgage, an order

quieting title to the Property in the name of Jesse Scott, and costs.  (*Id*.)

On January 21, 2014, BAC Home filed an Amended Answer to the Amended Complaint, asserting affirmative defenses and counterclaims against Scott.  (Am. Answer, ECF No. 16.) BAC Home also named Joseph as a counterclaim Defendant.  (*Id*.)  BAC Home asserts four counterclaims against Scott and Joseph:  (1) unjust enrichment; (2) equitable lien; (3) equitable subrogation; and (4) constructive trust.  (*Id*. at 14-17.)  On February 20, 2014, Joseph filed a motion to dismiss the counterclaims asserted against her by BAC Home in light of the foreclosure action pending against her in state court.  (ECF No. 22.)  On February 24, 2014, First American filed an Answer to Scott's Amended Complaint.  (First Am. Ans., ECF No. 25.)  On October 8, 2014, an Order was entered dismissing Sunny Pierce from this action.  (ECF No. 51.)

On September 15, 2014, Defendants BAC Home and First American each filed the instant Motions for Summary Judgment.  (BAC Home SJ Mot., ECF No. 47; First Am. SJ Mot., ECF No. 48.)  On October 29, 2013, Scott filed a Response in opposition to Defendants' Motions for Summary Judgment.  (Pl.'s SJ Resp., ECF No. 60.)  In support of his opposition to summary judgment, Scott also filed the report of the handwriting expert Wendy Carlson as an exhibit. (Carlson Rept., ECF No. 61.)[6]  On November 7, 2014, BAC Home filed a Reply in further support of summary judgment.  (BAC Home Reply, ECF No. 64.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on

---

[6] Defendants filed multiple motions to preclude the Court's consideration of Plaintiff's expert report by Wendy Carlson.  (*See* ECF Nos. 59, 62, 63.)  These motions will be addressed by separate order.

which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id.* The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 461 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.   BAC HOME'S MOTION FOR SUMMARY JUDGMENT

BAC Home moves for summary judgment on Count 1 of the Amended Complaint, the only claim asserted against it by Scott. In Count 1, Scott seeks to have the transfer deed declared

null and void, and to have the Countrywide Mortgage cancelled.  He contends that the Countrywide Mortgage is invalid and unenforceable because (1) he never executed the deed that transferred ownership between Scott and Joseph as husband and wife to Joseph individually; and (2) the Countrywide Mortgage was invalid because it was not executed by both Scott and Joseph, who were married at the time.  (Am. Compl. ¶ 19.)

BAC Home raises three arguments in support of summary judgment.  First, it argues that summary judgment is appropriate because Scott is unable to establish that the transfer deed was forged.  According to BAC Home, Scott signed the transfer deed, sent it to Pierce for recording, and was at all relevant times aware of, and in compliance with the refinancing.  Second, BAC Home argues that summary judgment is appropriate based on the "entireties presumption," a doctrine in Pennsylvania that recognizes the ability of one spouse to act for both with respect to property under certain circumstances.  Third, BAC Homes contends that summary judgment should be granted under the doctrine of laches because Scott's delay in filing suit constitutes a bar to his claim against BAC Home.

In the alternative, BAC Home contends that summary judgment is appropriate on its counterclaims against Scott and Joseph.  These counterclaims include:  (1) unjust enrichment; (2) equitable lien; (3) equitable subrogation; and (4) constructive trust.  We will first address BAC Home's arguments with regard to Scott's claim in Count 1.  Since we conclude that summary judgment in favor of BAC Home on Count 1 is appropriate, we need not reach the merits of BAC Home's counterclaims.

### A.     Disputed Issues of Fact Preclude Summary Judgment on the Forged Deed Theory

BAC Home contends that summary judgment is appropriate because the transfer deed is valid and the Countrywide Mortgage is enforceable.  It argues that Scott signed the transfer deed,

which purported to transfer ownership of the Property from Scott and Joseph jointly to Joseph

individually, and that as a result, the Countrywide Mortgage, which was executed by Joseph

only—as the sole owner of the Property—is valid and enforceable.  In support of this argument,

BAC Home presented the report of forensic document examiner William Ries.  Ries examined a

signature for Jesse Scott contained on the transfer deed and compared it to 28 known samples of

Scott's signature.  (Ries Report 1-2, Melley Decl. Ex. 12.)  Ries offered his opinion in a report

dated August 13, 2014.  (*Id.*)  Ries concluded, based on a reasonable degree of scientific

certainty, that the same person that authored the transfer deed authored the signatures on the 28

known samples of Scott's signature.  (*Id.* at 5.)  In other words, Ries opined that the signature on

the transfer deed was in fact Jesse Scott's signature.  (*Id.*)

　　　　In response, Scott maintains that he did not sign the transfer deed, but that the deed was

forged by either Pierce or Joseph.  Both Pierce and Joseph deny signing Scott's name to the

deed.  In support of his argument, Scott submitted the report of forensic document examiner

Wendy Carlson.  (Carlson Rept., Pl.'s SJ Resp. App. A.)  Carlson compared the signature

purporting to be Jesse Scott on the transfer deed to 30 samples of known signatures of Jesse

Scott.  (*Id.*)  Based on her examination, Carlson concluded that "[t]he Jesse Scott signature on

the [transfer deed] does not match known signatures of Jesse Scott, thereby revealing that the

Jesse Scott signature on the questioned document was authored by a different person than Jesse

Scott."  (*Id.* at 9.)

　　　　BAC Home contends that Plaintiff should not be permitted to rely on Carlson's report

because it was untimely submitted, in violation of the Court's scheduling order.  Carlson's report

was provided to defense counsel, together with Scott's brief in opposition to summary judgment,

on October 29, 2014.  The Court's April 29, 2014 Scheduling Order provided that Plaintiff's

expert reports were due no later than August 15, 2014, eight weeks before Scott actually submitted the report.  (*See* ECF No. 35.)  Even though Scott failed to comply with the Court's deadline, he nevertheless submitted his expert report prior to the Court's consideration of the summary judgment motions.  In addition, Defendants were provided an opportunity to respond to Scott's opposition to summary judgment, including the Carlson report.  BAC Home did in fact file a reply.  Under the circumstances, we will consider the report.  Viewing the record in a light most favorable to Plaintiff, there exists a disputed issue of material fact as to whether Scott actually signed the transfer deed.  As a result, we are compelled to deny summary judgment on this basis.

> **B.**      **Doctrine of Laches**

BAC Home also argues that summary judgment is appropriate under the equitable doctrine of laches.  Specifically, it contends that Scott inexcusably delayed filing this quiet title action, "despite having known (a) of the Countrywide Mortgage since early 2008 and having personally made a payment on the mortgage, and (b) that the property was titled only in Ms. Joseph's name since mid-2009, at the very latest."  (BAC Home SJ Mot. 19.)  BAC Home contends that Scott's delay has caused prejudice to BAC Home by causing "(a) an irreparable loss of evidence relating to the closing of the Countrywide Mortgage and the execution of the Transfer Deed, and (b) economic harm even beyond the absence of payments in accordance with the Countrywide Mortgage."  (*Id.*)

"Laches is an equitable doctrine which bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute action to the prejudice of another."  *In re Estate of Aiello*, 993 A.2d 283, 287 (Pa. Super. Ct. 2010); *see also Richland Twp. Planning Com. v. Bobiak*, 552 A.2d 1143, 1146 (Pa. Commw. Ct. 1989).  Laches applies to actions to quiet title.

*Ziminsky v. Ziminsky*, 231 A.2d 904, 907 (Pa. Super. Ct. 1967).  It consists of two elements:  "(1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay."  *Univ. of Pittsburgh v. Champion Prods, Inc*., 686 F.2d 1040, 1044 (3d Cir. 1982).  Prejudice "means that the party must change his position to his detriment."  *Aiello*, 993 A.2d at 287.  "The type of prejudice that supports the defense of laches includes loss of evidence, unavailability of witnesses due to the lapse of time or detrimental reliance by movant."  *United States v. Chavez*, No 83-344, 1987 U.S. Dist. LEXIS 12110, at *5 n.3 (E.D. Pa. Dec. 30, 1987).

Scott was aware of the Countrywide Mortgage and that he was not a party to that document as early as 2008.  Scott should also have been aware that his name was no longer on the deed as early as the summer of 2009, when he was served with a notice of the sheriff's sale in the foreclosure action, which named only Joseph as the owner of the Property.  However, Scott waited until 2013 to file the instant action to quiet title.  Certainly, Scott is guilty of delay.  Nevertheless, laches is an appropriate remedy only upon a showing of prejudice.  BAC Home contends that it was prejudiced because evidence has been lost, namely documents that no longer exist, and faded memories.  BAC Home also contends that it was economically prejudiced because it has been prevented from completing the foreclosure action, and has been incurring costs in taxes and insurance on the Property.  Such is not the type of prejudice that warrants the application of laches.  BAC Home has failed to show that they changed their position in any way or detrimentally relied on Plaintiff's delay in filing suit.  *See Aiello*, 993 A.2d at 287 (concluding that laches did not bar claim even though 20-year delay in filing suit caused records to be lost because there was no showing that appellant changed his position to his detriment as a result of the delay); *cf. Dorsch v. Jenkins*, 365 A.2d 861, 864 (Pa. Super. Ct. 1976) (concluding that laches applied because "[i]n the three year interval during which appellants allowed their action

to fall dormant, appellees, innocent third parties, acquired rights in the property . . . [and] the status quo [cannot be restored] without causing serious prejudice to appellees . . . .").  We are satisfied that laches does not bar Plaintiff's claim.  Summary judgment based upon the equitable doctrine of laches will therefore be denied.

C.      **Entireties Presumption**

Finally, BAC Home argues that the mortgage is enforceable pursuant to the entireties presumption.  "In Pennsylvania, a tenancy by the entireties is a form of co-ownership of real or personal property by husband and wife."  *In re Brannon*, 476 F.3d 170, 173 (3d Cir. 2007); *see also Plastipak Packaging, Inc. v. Depasquale*, 937 A.2d 1106, 1109 (Pa. Super. Ct. 2007) ("A conveyance of either real or personal property to a husband and wife, without more, vests in them an estate by the entireties.").  When either spouse dies, the survivor takes the property in its entirety.  *Depasquale*, 937 A.2d at 1109.  When property is owned as a tenancy by the entirety, "[n]either spouse may convey any interest in the estate without the other's authority or consent, nor perform any act or make any contract respecting the property which would prejudicially affect the other, for it belongs equally to both, and each has a joint right with the other to its possession, use and enjoyment during the existence of the marriage."  *Herb v. CitiMortgage, Inc.*, 955 F. Supp. 2d 441, 447 (M.D. Pa. 2013) (citing *Schweitzer v. Evans*, 63 A.2d 39, 40-41 (Pa. 1949)).  The parties do not dispute that the Property here was purchased by Scott and Joseph during their marriage, and that as a result, a tenancy by the entirety was created.

Pennsylvania law recognizes that "[t]here is, however, with respect to entireties property, a well-established presumption that during the term of a marriage either spouse has the power to act for both, without specific authorization, so long as the benefits of such action inure to both."  *J.R. Christ Construction Co., Inc. v. Olevsky*, 232 A.2d 196, 199 (Pa. 1967) (citation omitted);

14

*see also In re Brannon*, 476 F.3d at 173 ("[E]ither spouse presumptively has the power to act for both, so long as the marriage subsists, in matters of entireties, without any specific authorization, provided the fruits or proceeds of such action inures to the benefit of both and the estate is not terminated." (quoting *Madden v. Gosztonyi Savings & Trust Co*., 200 A. 624, 630-31 (Pa. 1938))).  This principle has become known as the "entireties presumption."  This presumption can render a mortgage enforceable even though only one spouse actually executed the mortgage. *See, e.g*., *Deutsche Bank Nat'l Trust Co. v. Evans*, 421 B.R. 193, 197 (W.D. Pa. 2009).  The presumption may be rebutted with evidence showing that "the spouse acting was not in fact authorized by the other spouse."  *Olevsky*, 232 A.2d at 199 (citation omitted).

In *Evans*, a debtor in bankruptcy sought to invalidate a recorded mortgage that was signed by the husband only and not the wife.  421 B.R. at 197.  The deed to the property listed the husband and wife.  *Id*. at 195.  The court determined that the entireties presumption applied because (1) the wife had knowledge of, and consented to the granting of the mortgage, and (2) the benefit of the mortgage, which allowed for the purchase of the home, inured to both spouses. *Id*. at 197.  The Court stated:

> In this instance, [wife] had knowledge of, and consented to, the granting of the mortgage executed only by her husband [ ].  The purchase money mortgage was used to complete the purchase of the family home.  The benefit of the mortgage, therefore, inured to both [husband] and [wife], and the transaction did not divest the entireties property from the marital estate. It certainly appears to this Court that the entireties presumption should apply in this instance.

*Id*.  Here, Jesse Scott does not dispute that he was aware that Joseph was going to refinance the property.  In fact, when they first purchased the property, Scott and Joseph discussed seeking a refinancing because of the high interest rate on the New Century Mortgage.  Scott also does not dispute the fact that he authorized the refinancing.  (Pl.'s Resp. 9 ("Mr. Scott authorized Ms. Joseph to refinance the New Century Loan to obtain a more favorable interest rate.")  Clearly,

the entireties presumption applies here, and the Countrywide Mortgage is enforceable.  *Evans*, 421 B.R. at 197.[7]  Because the mortgage is enforceable, partial summary judgment is appropriate with respect to Count 1.  However, because disputed issues of fact remain regarding the transfer deed, we are compelled to deny summary judgment with respect to Scott's request in Count 1 to quiet title.[8]

## IV.   FIRST AMERICAN'S MOTION FOR SUMMARY JUDGMENT

Scott asserts one claim against First American.  The contours and substance of Scott's claim against First American are far from clear.[9]  He alleges the following:

22.     First American is a title Insurance Company pursuant to 40 P.S. section 910 . . .

23.     Defendant, [Sunny] Pierce was at all relevant times was [sic] an agent of Defendant First American by appointment, acting in an agency capacity.

24.     Title 31, Pa. Code, § 126.1, which states that title insurance companies

---

[7] Scott makes a passing reference to a Pennsylvania recording statute in his opposition to summary judgment.  Specifically, he contends that the Countrywide Mortgage is void because it was not recorded within 6 months of execution, in violation of 21 P.S. § 621.  That statute states that

No deed or mortgage, or defeasible deed, in the nature of mortgages, hereafter to be made, shall be good or sufficient to convey or pass any freehold or inheritance, or to grant any estate therein for life or years, unless such deed be acknowledged or proved and recorded within six months after the date thereof, where such lands lie, as hereinbefore directed for other deeds.

21 P.S. § 621.  However, the failure to record a deed within six months does not render the deed "absolutely void," but instead "void only to the extent necessary to protect the rights of a subsequent bona fide mortgagee or purchaser for value."  *United States v. Crissman*, No. 09-1884, 2011 U.S. Dist. LEXIS 110705, at *16-17 (M.D. Pa. Sept. 28, 2011).

[8] As noted above, since we find that the mortgage is enforceable, we need not address the merits of BAC Home's counterclaims, which all seek equitable relief in the form of declaring the mortgage enforceable.  BAC Home's arguments with respect to its counterclaims against Scott will therefore be dismissed as moot.

[9] In fact, all of Scott's pleadings in this matter are not models of clarity.

16

and agents of title insurance companies, issuing mortgagee's title insurance upon a loan made simultaneously with the purchase of all or a part of the real estate securing the loans, where no owner's title insurance policy has been ordered; shall, prior to the disbursement of the loan funds or the issuance of the mortgagee's title policy, cause the mortgagor to be advised in writing of the fact that a mortgagee's title insurance policy is to be issued, of the fact that the policy does not afford title insurance protection to the owner-mortgagor, and if the owner-mortgagor elects not to purchase owner's title insurance, the title insurance company shall obtain from the mortgagor a statement in writing that the mortgagor waives the right to purchase owner's title insurance.  The form of the written notice and waiver shall be in the prescribed form.

25.     On November 2, 2006, Defendant First American failed to advise Plaintiff that he had a right to purchase owner's title insurance.  It is also doubtful that Defendant First American gave notice to plaintiff's spouse her right to purchase owner's title Insurance (the alleged transfer of title from Plaintiff and his wife to wife only may have cancelled any owners coverage previously issued.)

26.     Defendant First American failed to reinforce internal controls to ensure that all records and documents were maintained in accordance with the Insurance Department Act and the Unfair Insurance Practices Act so that the fraudulent deed recorded by defendant Pierce 19 months after its alleged execution in November 2006 did not occur.

27.     As a result of Defendant First American [sic] failure to properly supervise its agent, Sunny Pierce, Plaintiff has and will suffer irreparable injury.

(Am. Compl. ¶¶ 22-27.)   As relief, Scott demands an order declaring that the Countrywide Mortgage is null and void, and cancelling the Countrywide Mortgage.  (*Id.*)  He also seeks costs for filing this suit.  (*Id.*)  Importantly, Scott does not request monetary damages against First American.[10]

First American argues that this claim should be dismissed.  It argues that because the deed was not forged, then it should not be liable for any alleged failure to supervise Pierce, its

---

[10] In lieu of money damages, Scott merely requests that title to the Property be quieted in his name, free and clear of all liens.  However, First American is not a proper party to the quiet title action because it has no lien on, or interest in, the Property.  (*See* First Am. SJ Mot. 26); *see also Jobe v. Bank of Am., N.A.*, No. 10-1710, 2013 U.S. Dist. LEXIS 49466, at *10-12 (M.D. Pa. Apr. 5, 2013) (dismissing action to quiet title against defendants who possess no interest in the property); *Porter v. Samuel*, 889 F. Supp. 213, 220 (D.V.I. 1995) ("[T]he quiet title plaintiff must bring suit against anyone claiming an interest in the property.").

agent, in connection with the refinance.  First American also argues it did not violate Pa. Code §

126.1 as that section does not apply.  Finally, First American contends that Scott has offered no

evidence to support his proposition that it "failed to properly supervise its agent" or "failed to

reinforce internal controls to ensure that all records and documents were maintained in

accordance with the Insurance Department Act and the Unfair Insurance Practices Act."  (First

Am. Mot. 25-26 (citing Compl.).)  Scott does not respond to the arguments raised by First

American.  He merely maintains that his signature on the transfer deed was forged.  However,

because there is a disputed issue of fact as to whether Scott actually signed the transfer deed, *see*

*Supra* Section III.A, we cannot grant summary judgment on this basis.

With regard to First American's remaining arguments, Scott alleges that First American

violated 31 Pa. Code § 126.1.  That regulation is found in the chapter regarding Owner-

Mortgagee Title Insurance, and states:

> Title insurance companies and agents of title insurance companies, issuing
> mortgagee's title insurance upon a loan made simultaneously with the purchase of
> all or a part of the real estate securing the loans, where no owner's title insurance
> policy has been ordered; shall, prior to the disbursement of the loan funds or the
> issuance of the mortgagee's title policy, cause the mortgagor to be advised in
> writing of the fact that a mortgagee's title insurance policy is to be issued, of the
> fact that the policy does not afford title insurance protection to the owner-
> mortgagor, and of the owner-mortgagor's right to obtain title insurance in his own
> favor; and if the mortgagor elects not to purchase owner's title insurance, the title
> insurance company shall obtain from the mortgagor a statement in writing that the
> mortgagor has received the notice and that the mortgagor waives the right to
> purchase owner's title insurance.

31 Pa. Code § 126.1.

First American argues that the regulation does not apply because it expressly pertains to

the "purchase of all or part of the real estate," and the Countrywide Mortgage at issue here was a

refinance transaction, not a purchase transaction.  Scott not only failed to point to any authority

refuting First American's characterization of this regulation, he entirely ignored this argument in

his Response to summary judgment.  We agree with First American that the regulation does not apply to the refinance at issue in this case.  Even if it did, Scott has failed to show that the regulation provides him recourse to hold First American liable for any violation of the regulation.  A review of Chapter 126 of the Pennsylvania Code reveals that there is no regulation expressly providing for a private right of action.  *See Rovner v. Keystone Human Servs.*, No. 11-2335, 2013 U.S. Dist. LEXIS 111336, at *39-40 (M.D. Pa. July 18, 2013) (dismissing claim for violation of a Public Welfare regulation and recognizing that regulation at issue did not explicitly provide for a private cause of action).  Moreover, we were unable to find any authority, and Scott has provided none, in which a title insurance company was held liable to a private individual under the regulation at issue here.  Even if the regulation did provide a private right of action, Scott has submitted no evidence supporting his contention that First American violated the regulation in any way.

First American also contends that the claim should be dismissed because Scott has failed to support his allegations that First American failed to supervise Pierce, its alleged agent, and failed to reinforce internal controls.  We agree.  Again, Scott has not responded to First American's argument.  It seems apparent that Scott has abandoned his claim against First American.  However, even if we were to consider the merits of Scott's claim, summary judgment is nevertheless appropriate.  The record contains no evidence with regard to First American's record-keeping procedures, let alone whether those procedures were in accordance it the Insurance Department Act and the Unfair Insurance Practices Act.  The record is also devoid of any evidence relating to any wrongdoing on the part of First American with regard to supervision.  Even accepting Scott's bald assertion that the transfer deed was forged by Pierce, there is no evidence in the record showing that First American had knowledge and failed to act in

19

any way that the law required of it.  Viewing the record in the light most favorable to Scott, there

are no disputes as to any material facts.  Summary judgment is appropriate in favor of First

American on Count 3 of the Amended Complaint.

## V.  LOUDINE JOSEPH'S MOTION TO DISMISS

BAC Home asserts four counterclaims against Loudine Joseph:  (1) unjust enrichment;

(2) equitable lien; (3) equitable subrogation; and (4) constructive trust.  For all of these counts,

BAC Home seeks judgment in its favor, and equitable relief in the amount of the Countrywide

Mortgage.  (BAC Home Am. Ans.)  Joseph moves to dismiss these counterclaims on the basis of

res judicata.  Specifically, she contends that BAC Home already sought and received the same

relief in the mortgage foreclosure action filed against her in the Montgomery County Court of

Common Pleas.  In that case, judgment was entered against Joseph in the amount of

$478,464.69.  (Joseph Mot. Dismiss ¶ 5 & Ex. A.)

Under the doctrine of res judicata, when "a court of competent jurisdiction has

determined a litigated cause on its merits, the judgment entered, until reversed, is forever and

under all circumstances, final and conclusive as between the parties . . . ."  *Bearoff v. Bearoff*

*Brothers, Inc*., 327 A.2d 72, 75 (1974) (internal citation and quotation marks omitted); *see also*

*Mintz v. Carlton House Partners, Ltd*., 595 A.2d 1240, 1245 (1991) ("A final valid judgment

upon the merits by a court of competent jurisdiction bars any future suit between the same parties

or their privies on the same cause of action." (internal citation and quotation marks omitted)).

Res judicata applies and bars a later action when the two actions share the following four

conditions:  (1) identity of the thing sued upon or for; (2) identity of the cause of action; (3)

identity of the persons and parties or their privies to the action; and (4) identity of the capacity of

the parties to sue or be sued.  *R & J Holding Co. v. Redevelopment Auth*., 670 F.3d 420, 427 (3d

Cir. 2011) (citing *Bearoff*, 327 A.2d at 74).

Here, BAC Home's counterclaims against Joseph are barred by res judicata.  In the state foreclosure action, BAC Home sought judgment against Joseph for defaulting on the Countrywide Mortgage.  Here, BAC Home seeks the same relief, although in the form of equitable relief.  The identity of the thing sued upon, and the identity of the parties are the same. Moreover, it is of no consequence that the former action by BAC Home against Joseph resulted in a default judgment because under Pennsylvania law, default judgments have res judicata effect.  *Fox v. Gabler*, 626 A.2d 1141, 1143 (Pa. 1993) ("[W]e long ago concluded that the judgment by default is res judicata and quite as conclusive as one rendered on a verdict after litigation insofar as a defaulting defendant is concerned."); *see also Schuldiner v. K Mart Corp.*, 284 F. App'x 918, 921 (3d Cir. 2008) ("[A] default judgment is a final judgment with res judicata effect.").  Accordingly, Joseph's Motion to Dismiss will be granted.

## VI.   CONCLUSION

For the foregoing reasons, Defendant First American's Motion for Summary Judgment will be granted, Defendant BAC Home's Motion for Summary Judgment will be granted in part, denied in part, and dismissed as moot in part, and Loudine Joseph's Motion to Dismiss will be granted.

An appropriate Order will follow.

BY THE COURT:

_____

**R. BARCLAY SURRICK,   J.**